UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-14015-CR-GRAHAM/MAYNARD
CASE NO. 17-14050-ROSENBERG/MAYNARD

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ANDRE JAMAAL WILLIAMS,

    Defendant.
_____/

## REPORT AND RECOMMENDATION FOLLOWING FINAL HEARING ON ALLEGED VIOLATION OF SUPERVISED RELEASE

**THIS CAUSE** is before me following a final hearing on an alleged violation of supervised release. On October 16, 2024, United States Probation filed substantially similar Petitions for Warrant or Summons for Offender Under Supervision ("Petitions") in two criminal cases alleging that Defendant Andre Jamaal Williams violated his supervised release as follows:

> 1. **Violation of Mandatory Condition,** by failing to refrain from violation of the law. On or about October 9, 2024, in Hollywood, Florida, the defendant did commit the offense of Domestic Battery by Strangulation, in violation of Florida State Statute 784.041.

DE 224 [015]; DE 111 [050].[1]  I held a hearing on January 6, 2025 and a final hearing in both cases is currently set to take place before United States District Judge Donald L. Graham on February 28, 2025.

---

[1] The Petitions and all subsequent related activity are filed separately in each case. For ease of reference, citations to *U.S. v. Williams*, Case No. 04-14015-Cr-Graham/Maynard, will be "DE __ [015]," and citations to *U.S. v. Williams*, Case No. 17-14050-Cr-Rosenberg/Maynard, will be "DE __ [050]." For ease of reference, I will cite principally to the filings in the first-filed case ending in 015.

1

Having carefully considered the record in both cases—including the sworn testimony, the evidence submitted, and the arguments of counsel—I respectfully recommend that the District Court find Defendant not guilty of the alleged violation and that the Petitions be dismissed.

## BACKGROUND

In 2004, Defendant was convicted of possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1). DE 66 [015]. On October 25, 2005, United States District Judge Donald L. Graham sentenced Defendant to 120 months in federal prison, followed by eight years of supervised release. *Id.* On December 15, 2016, Defendant was ordered to complete 100 hours of community service based on his submission of a urine sample which tested positive for marijuana while under federal supervision. DE 143 [015].

In 2018, while still under federal supervision, Defendant was convicted of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D). DE 91 [050]. On April 20, 2018, Judge Graham sentenced Defendant to 84 months in federal prison, followed by four years of supervised release. *Id.* Additionally, based on Defendant's possession of drugs and firearms as a convicted felon, Defendant's term of supervised release was revoked and Defendant was sentenced to six additional months in prison, to be followed by three years of supervised release. DE 192 [015].

Defendant's supervised release was reinstated on May 21, 2024. Less than five months later, on October 16, 2024, Defendant was charged in the instant Petitions with violating a mandatory condition of his supervised release by failing to refrain from a violation of the law. According to the Petitions, on October 9, 2024, in Hollywood, Florida, Defendant violated his supervised release conditions by committing the offense of domestic battery by strangulation contrary to Florida law.

## FINAL HEARING

On January 6, 2025, I held a contested final hearing on the sole alleged violation. DE 241 [015]. The Government called two witnesses to testify. In addition, two sealed exhibits consisting of police body camera video footage and a recorded 911 phone call were admitted into evidence.[2]

First, the Government called Seminole Police Officer Datron Foster. Officer Foster testified as follows. He has worked as road/casino patrol for the Seminole Hard Rock Hotel and Casino in Hollywood for a little over one year. In this role, he frequently interacts with hotel and casino patrons. He uses an assigned body worn camera during public interactions and calls for service. At approximately 1:00 A.M. on October 9, 2024, Officer Foster responded to a domestic violence call involving Defendant and an alleged victim, K.M. Officer Foster activated his body camera upon arrival. The government offered Exhibit 1 into evidence, which is Officer Foster's body camera video footage from that night. DE 239 [015] ("GX 1"—Body Camera Video Footage).

---

[2] Both exhibits have been sealed to protect the alleged victim's privacy interests. At my instruction, both sides provided transcripts of the body camera video footage and the recorded 911 call after the hearing.

In the video, which was played in open court, Officer Foster first encountered Defendant near the elevators at the ground floor. *Id.* at 1:01. Officer Foster shone his flashlight on Defendant's hands and head area; there were no visible marks. GX 1 at 1:03. Defendant told Officer Foster he and K.M. were "[j]ust arguing; male/female whatever, going through your phone, bullsh*% upset" but that nothing physical happened at any point, including pushing or shoving. DE 241 [015] at 12; GX 1 at 1:01-1:05.

Officer Foster then took the elevator upstairs and went inside the hotel room where K.M. was crying while seated at a table near the window. GX 1 at 1:05. K.M. told Officer Foster she thought Defendant was going to kill her by choking her with his hands and that he "was choking me under the chair there and every time I got a chance to scream, I would scream hoping that the neighbors could hear me." DE 241 [015] at 13; GX 1 at 1:06. When asked if Defendant struck, punch, or scratched her, K.M. responded "I don't know…I haven't even looked in the mirror." DE 241 [015] at 13.

Using a flashlight, Officer Foster observed a faint scratch on K.M.'s lip. DE 241 [015] at 13-14; GX 1 at 1:06. Officer Foster also observed a small faint mark on K.M.'s neck that she indicated was the result of a tattoo removal. K.M. told Officer Foster that she and Defendant have a 20-year-old son together but she had not spoken to Defendant in the last 30 days because it had been "drama, after drama, after drama" since Defendant returned home from prison three months prior. DE 241 [015] at 14-15; GX 1 at 1:08. K.M. told Officer Foster that she had told Defendant she would be staying at the hotel, the two of them walked to the hotel room together, and when they got into the room, they started fighting and Defendant grabbed her, threw her on the bed, and they fought in the bathroom until she was under a bench in the room "and he was

choking me and I thought that was the last breath of my life." DE 241 [015] at 16-17; GX 1 at 1:09-1:10. K.M. stated that sometime during the fight, Defendant threw her against a wall. DE 241 [015] at 18-19, 26. K.M. further stated that Defendant took her phone during the fight, but she somehow got it back, called 911, and threw the phone so that the altercation would be recorded. DE 241 [015] at 20-21.

In the body camera video, the hotel room appears largely undisturbed. A bench is observed at the foot of the bed with an open suitcase on top and K.M. indicated to Officer Foster that Defendant choked her underneath this bench. There is a slightly crushed lamp shade on the wall against which K.M. says Defendant threw her.

The Government then offered Exhibit 2 into evidence, which is the recorded 911 call from that night. DE 239 [015] (GX 2—911 Recording). In the recording, the 911 operator acknowledges a female caller on the line who is overheard crying but "she hasn't responded to me the entire time that I've been on the call with her." *Id.* at 0:40-0:43. The operator says she overheard: "You tried to kill me…you just choked me…and…" and she further heard a door close "hear[d] the gentleman leave, but it has to be domestic [be]cause she told him not to contact their son again." *Id.* at 0:21-0:26, 1:24-1:45. The 911 call continues wherein it is confirmed by the operators and police dispatchers on the call that Defendant had walked away from the room and that the police made contact with him on the ground floor.

On cross-examination, Officer Foster could not recall how long it took him to respond to the domestic violence call, but confirmed that upon arriving, he first met and spoke with Defendant outside the hotel room. DE 241 [015] at 30-31. Officer Foster saw no marks, bruises, or scratches on Defendant. *Id.* at 32. When Officer Foster got upstairs to the hotel

room, there was security personnel at the door who had secured the scene for investigating officers. *Id.* at 33. Officer Foster confirmed that when he entered the room, K.M. said she and Defendant had been in an argument turned physical, Defendant threw her against a wall, and Defendant choked her underneath a table at the foot of the bed to the point where she thought she would lose her life. *Id.* at 34-36. Officer Foster further confirmed that K.M. told him that she had thrown her phone during the incident but she wasn't able to tell him exactly how she got the phone back or where she threw the phone. *Id.* at 37-38. Officer Foster confirmed that K.M. was a fair skinned woman and when he saw what looked like an abrasion on the right side of her neck, K.M. said that mark was related to a tattoo removal. *Id.* at 42. The only other visible mark was a scratch on K.M.'s lip. *Id.* Officer Foster did not record or observe any other marks around K.M.'s neck. *Id.* at 43.

The next witness called by the Government was United States Probation Officer (USPO) Ronald Clark. USPO Clark testified that he supervises Defendant. *Id.* at 45. Sometime in October, Defendant called USPO Clark to report his arrest on a domestic violence charge. *Id.* at 47. According to USPO Clark, on October 16, 2024, fellow USPO Beau McGee interviewed K.M. *Id.* at 47-48. According to USPO Clark, USPO McGee advised him that K.M. said she feared Defendant and that he was not abiding by an existing no contact order. *Id.* at 48. In the days and weeks that followed, however, K.M. called USPO Clark to state that she no longer wished to cooperate. *Id.* On cross examination, USPO Clark confirmed that USPO McGee never visually saw K.M. *Id.* at 49.

Defendant did not call any witnesses or present any evidence. Following the hearing, the Government filed a notice indicating that "the State declined to file charges and the case is now closed." DE 243 [015].

## ANALYSIS

The standard of proof in violations of supervised release is by a preponderance of the evidence and not beyond a reasonable doubt. Revocation of supervised release is treated as part of the penalty phase for the initial offense involved. To constitute a violation, the conduct involved need not be criminal and the defendant need only be found culpable by a judge under a preponderance of the evidence standard. *U.S. v. Cunningham*, 607 F.3d 1264 (11th Cir. 2010). The preponderance standard is met if it is "more likely than not" that the defendant violated a condition of his supervised release. *U.S. v. Williams*, 800 F. App'x 734, 736 (11th Cir. 2020) (quoting *U.S. v. Cataldo*, 171 F.3d 1316, 1322 (11th Cir. 1999)).

Importantly, Defendants involved in revocation proceedings are entitled to certain minimal due process requirements. *U.S. v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994). Among these requirements is the right to confront and cross-examine adverse witnesses, "unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2). To determine whether to rely on hearsay testimony, the court must balance the defendant's right to confront adverse witnesses against the grounds asserted by the government for denying confrontation, which generally requires a focus on the trustworthiness and reliability of the hearsay statements. *U.S. v. Penn*, 721 F.2d 762, 764-65 (11th Cir. 1983). For example, statements close in time to the event at issue are more likely to be based on fresh recollection and carry a diminished likelihood of deliberate or conscious misrepresentation.

*U.S. v. Reme*, 738 F.2d 1156, 1168 (11th Cir. 1984). Whether the hearsay declarant's statement is supported by other evidence in the record is also relevant in determining reliability. *Id.*

Here, the Petitions allege that Defendant violated his term of supervised release by committing the offense of domestic battery by strangulation in violation of Florida law. Under Florida Statute § 784.041:

> A person commits domestic battery by strangulation if the person knowingly and intentionally, against the will of another, impedes the normal breathing or circulation of the blood of a family or household member or of a person with whom he or she is in a dating relationship, so as to create a risk of or cause great bodily harm by applying pressure on the throat or neck of the other person or by blocking the nose or mouth of the other person.

Fla. Stat. § 784.041(2)(a). This statute requires proof that the defendant knowingly and intentionally (1) impedes the normal breathing of a victim against her will by applying pressure on the throat or neck or by blocking the nose or mouth; (2) in so doing creates a risk of or causes great bodily harm; and (3) the person is a family member of the victim. Individuals who have children together are "family members" for these purposes. *Id.*; *In re Std. Jury Instructions in Crim. Cases—Report No. 2018–14*, 267 So. 3d 980, 982-83, No. 8.5(a) Domestic Battery by Strangulation (Fla. 2019).

The Government maintains that K.M.'s statements made in the body camera video footage are sufficiently reliable and trustworthy to prove that Defendant committed the above state law offense. The Government further maintains that the recorded 911 call serves as significant corroborating evidence. On the other hand, defense counsel argues that the evidence does not support a finding that Defendant committed the alleged offense. For instance, defense counsel contends that the hotel room as seen on the body camera video footage immediately

following the incident showed no signs of a struggle.  In addition, defense counsel points to Officer Foster's sworn testimony that he observed no marks on Defendant and no marks on or around K.M.'s neck (apart from the mark that K.M. admitted was solely the result of a removed tattoo) immediately after the incident.  Further, defense counsel argues that the lack of any response by K.M. to the 911 operators even after Defendant is overheard leaving the room runs contrary to her claim that Defendant had violently choked her in the room.

In light of the evidence presented and the parties' argument, as well as my credibility determinations, I find that the Government has not met its burden to show, by a preponderance of the evidence, that Defendant violated a mandatory condition of his supervised release by committing an offense prohibited by Florida Statute § 784.041.  The following reasons support this finding.

First, Officer Foster testified that he saw no incriminating marks on Defendant or K.M. immediately following the incident.  A review of the body camera video footage coincides with Officer Foster's sworn testimony on this point.  There is no evidence that K.M., who is fair-skinned, had any redness or markings around her neck as could be expected in the moments following an incident of forced strangulation.

Second, Officer Foster interacted with K.M. immediately after the incident as confirmed by his testimony and his body camera video.  A review of his body camera video depicts a largely intact and undisturbed hotel room.  There are limited to no visible signs of a violent struggle.

Third, the recorded 911 call contains no statements made by K.M. in response to dispatcher questioning and remarks even after there is an indication that Defendant left the

room.  The fact that Officer Foster first encountered Defendant outside the room lends credibility to the 911 operator's statements that the alleged assailant had left the room.

Fourth, K.M. did not testify at the hearing and indicated to United States Probation that she did not wish to cooperate further in pursuing the charge against Defendant.  The state has declined to file charges against Defendant and the underlying state court case is closed.  Under the circumstances, I decline to rely on K.M.'s or USPO McGee's hearsay statements as they are not supported by other evidence in the record, as described above, which diminishes the trustworthiness and reliability of such statements.  On balance, in this instance, Defendant's right to confront adverse witnesses outweighs any asserted grounds for denying confrontation. While I do not doubt that Defendant and K.M. had an argument that may have turned physical, it has not been shown by a preponderance of the evidence that Defendant committed the Florida offense of domestic battery by strangulation.[3]  The Government has not met its burden in this regard.

**ACCORDINGLY**, I recommend to the District Court that the Defendant be found not guilty of violating a mandatory condition of his supervised release and that the pending petition in each case be dismissed.

---

[3] Notwithstanding this finding, I write separately to note my serious concerns about Defendant's alleged conduct towards the mother of his son.  Respect, civility, and nonviolent resolution of personal disagreements are of utmost importance in a civil society and angry, abusive behavior does not conform to basic societal norms.  Even if this recommendation is adopted and the alleged violation is dismissed, Defendant is on notice that physical violence towards others will not be tolerated from one who is under federal supervision, and future allegations of this nature will be closely scrutinized by this Court.

**NOTICE OF RIGHT TO OBJECT**

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Donald L. Graham, United States District Judge for the Southern District of Florida. Pursuant to Federal Rule of Criminal Procedure 59(b)(2), failure to file a timely objection to this Report and Recommendation waives the party's right to review, and it bars the party from attacking on appeal any legal rulings or fact findings contained herein.

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 6th day of February, 2025.

_____
SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE